## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

ALUMINUM SPECIALTIES
WHOLESALE, INC.,

     Plaintiff,

                         Civil Action No.: _____

vs.

JSN MASTER DISTRIBUTORS, LLC and
STEVEN ASHE,

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Aluminum Specialties Wholesale, Inc., a Florida corporation ("ASW"), by counsel, alleges as follows against defendants JSN Master Distributors, LLC ("JSN"), a Florida limited liability company and Steven Ashe, an individual and Florida resident (collectively, "Defendants"), and together with ASW, the ("Parties").

### INTRODUCTION

ASW and JSN, both Florida entities, with Florida residents as CEOs, had an exclusivity deal surrounding the sourcing, importation, distribution and marketing in the United States of certain insect screens manufactured in China. JSN not only broke the deal, but unlawfully used ASW's trademark in the process, causing ASW to suffer hundreds of thousands of dollars in damages caused by

1

Defendants' breach of the Parties' contract, violation of unfair competition under Florida law, false designation of origin and unfair competition under the Lanham Act, violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), common law trademark infringement,  unfair competition and breach of the covenant of good faith and fair dealing. Defendants' acts were willful and ASW now seeks relief and demands a trial by jury.

## PARTIES

1.      ASW is a Florida corporation whose principal place of business is located at 1523 Edgar Place, Sarasota, Florida 34240.

2.      JSN is a Florida limited liability company whose principal place of business is located at 502 S. Albany Avenue, Tampa, Florida 33606.

3.      ASW's CEO, Shawn Brown is a resident of Florida ("Brown").

4.      Steven Ashe is CEO of JSN and is also a resident of Florida ("Ashe").

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 15 U.S.C. §1125(a) and 28 U.S.C. §1367(a).

6.      Venue is proper pursuant to 28 U.S.C. §1391(a) because all Defendants reside or have a principal place of business in the Middle District of Florida.

## FACTUAL BACKGROUND

7.    ASW is a wholesale distribution company based in Sarasota, FL. Among other products, it markets and distributes patio screens across the United States under the brand name, "Perfect Patio."

8.    JSN is a limited liability company based in Tampa, FL that imports goods from overseas including China, with Ashe serving as its registered agent and, upon information and belief, a managing member.

9.    ASW entered a binding contract with JSN, an importer based in Tampa, Florida called the "Exclusivity Agreement for Chinese Insect Screen" with an effective date of May 2, 2017 ("Exclusivity Agreement"), signed by Brown and Ashe. A true and correct copy of a later version of the Exclusivity Agreement is attached to this Complaint and is labeled "**Exhibit A.**"[1]

10.    The Exclusivity Agreement empowers ASW as marketer and distributor in the United States for specific types of insect screens manufactured in China that JSN imported into the United States ("Screens").

---

[1] Plaintiff is searching its records for the original agreement and will file it as a supplement to this Complaint if and when it finds it.  However, Exhibit A is not different in any material way from the 2017 agreement except for the Effective Date. And the causes of action all arise in 2025.

11.     The Exclusivity Agreement expressly forbids JSN from using ASW's common law trademark, "Perfect Patio" ("Mark") when importing the Screens to anyone but ASW.[2]

12.     To ensure compliance with this provision, the Parties created a system where Screens ordered by ASW would include orange or green thread.

13.     The Parties worked together under the Exclusivity Agreement for sixty (60) months. However, problems started when Brown, sensing President Donald J. Trump would win the 2024 Presidential Election and slap tariffs on China, started hedging his bets by sourcing similar patio screens from Taiwan in addition to those from JSN. This was not prohibited under the Exclusivity Agreement. But Brown, out of courtesy, notified JSN CEO Steven Ashe about it soon after it began. Ashe did not object and the deal lived on.

14.     As of March 2025, ASW had an outstanding purchase order with JSN for three (3) containers of Screens.

15.     However, JSN failed to deliver the three containers of Screens.

16.     The retail value of the three containers was $787,874 which, based on previous sales figures, would have grossed ASW $236,602.

---

[2] Brown created the Mark and Perfect Patio brand in 20017 while working for AWS, then made ASW the exclusive distributor of all products under the Mark and brand pursuant to a written agreement dated March 22, 2017.

17.    Meanwhile, Brown started hearing accounts of JSN selling Screens directly to AWS competitors and customers.

18.    Things came to a head during a face-to-face meeting with Brown, ASW's operations manager and Ashe on or around April 10, 2025, where the parties confronted each other about working with competitors which, while not a breach of the Exclusivity Agreement, threatened to upend their relationship. Ashe, in particular, got very upset.

19.    Nevertheless, Brown restated ASW's intention to honor its commitment to one order of Screens from JSN per month until the end of 2025 (8 in total) and allocate $2 million dollars to market and distribute them. This calmed Ashe.

20.    Brown's good faith efforts proved naïve. Upon information and belief, Defendants continued to divert Screens away from ASW by selling them directly to ASW customers and competitors, now in bigger amounts.

21.    As a result, ASW's Screen sales plummeted from a high-water mark of $489,857 in March of 2025 to $168,233 in August of 2025.

22.    ASW also lost metal sales because customers customarily bought metal goods with their Screens purchase as well.

23.     Furthermore, Brown started hearing that Defendants were using its Mark by selling the Screens to third parties with the Mark affixed to packaging, in violation of the Exclusivity Agreement.

24.     On September 29, 2025, Brown sent Ashe an email demanding JSN and Ashe stop using its Mark on such shipments. Ashe denied they ever did and promised not to in the future.

25.     Yet Brown kept hearing similar reports and, seeking hard evidence, placed an order of Screens from a wholesale competitor, Eastern Metal Supply, located in Lake Worth, Florida ("EMS") to be delivered to ASW's warehouse on July 2, 2025.

26.     Seven days later, on July 9, 2025, EMS employees delivered the Screens, which had the Mark plastered all over them. True and correct photographs of the EMS delivery of the Screens with the Mark affixed are attached to this Complaint and are labeled "**Exhibit B**".

27.     Upon information and belief, JSN used the Mark in the same way with other third parties besides EMS, all without authorization or payment to ASW.

28.     Upon information and belief, JSN imported the subset of orange and green thread Screens reserved for ASW to third parties as well and continues to do so to this day.

29.    Upon information and belief, Ashe participated directly and oversaw/exercised control over JSN's above-described acts at all relevant times.

30.    Upon information and belief, the above-described acts by Defendants are ongoing.

31.    On September 29, 2025, ASW, through its attorney, sent Ashe a demand letter attached to an email which Ashe ignored. However, Ashe did send a text message to Brown, calling the claims "B.S."

32.    As a result of Defendants' above-described bad acts, ASW has suffered significant harm to its business, sales, goodwill, and trademark rights and hereby requests relief and demands a trial by jury.

## COUNT I – BREACH OF CONTRACT
### (JSN)

33.    ASW realleges and incorporates by reference the allegations contained in paragraphs 1-32 as though fully set forth herein.

34.    ASW and JSN, by their authorized representatives, Brown and Ashe, each acting under their own volition, entered a binding and enforceable contract supported by sufficient consideration, with an effective date of May 2, 2017, which the parties worked together under thereafter and and ratified via a separate writing in 2024 titled "Exclusivity Agreement", a true and correct copy of which attached as Exhibit A ("Exclusivity Agreement").

35.     At all times ASW performed or remained ready, willing and able to perform its obligations under the Exclusivity Agreement, purchasing certain Screens made in China from JSN and marketing and distributing them across the United States.

36.     On or around January 15, 2025, ASW placed an order with JSN for three (3) containers of Screens that carried a retail value of $787,874.

37.     JSN never delivered thos containers to ASW.

38.     JSN's failure to deliver the three containers constituted a breach of the Exclusivity Agreement ("1st Breach").

39.     JSN's 1st Breach proximately caused ASW to suffer no less than $236,362 in lost profits in Screen sales.

40.     JSN also failed to honor its commitment to import to ASW one container per month from April through December of 2025 (8 total).

41.     This failure constituted a second breach of the Exclusivity Agreement by JSN ("2nd Breach").

42.     JSN's 2nd Breach proximately caused ASW to lose $630,299.00 in profits.

43.     The above Breaches also proximately caused ASW to lose out on metal sales that its customers typically purchased along with Screens.

44.     The above Breaches also proximately caused ASW to suffer out of pocket costs incurred in readying for the marketing and distribution of the Screens that JSN failed to deliver.

45.     The Agreement further prohibited JSN from importing Screens to third parties using ASW's brand name and trademark "Perfect Patio" — the Mark.

46.     On July 2, 2025, employees of third-party and ASW competitor EMS delivered an order of Screens Brown had placed to an ASW warehouse, with the Mark affixed to the packaging. See Exhibit B.

47.     ASW did not consent to, license or authorize JSN to use its Mark in the sales or importation of the Screens to third parties like EMS.

48.     This unauthorized use of the Mark constituted a third breach of the Exclusivity Agreement by JSN ("3rd Breach").

49.     Upon information and belief, JSN imported Screens to other third parties besides EMS using the Mark and continues to do so to this day.

50.     JSN's 3rd Breach proximately caused ASW to lose sales and profits as well as damage to its business reputation in the trade.

51.     ASW and JSN had an additional agreement for the exclusive importation of a subset of Screens sized designated by orange or green thread.

52.     Upon information and belief, JSN breached this additional agreement by importing said subset of Screens to third parties.

53.     Upon information and belief, JSN continues to import this subset of Screens to third parties to this day.

54.     The above breach of the additional agreement proximately caused and continues to cause ASW to lose profits and sales from the subset of Screens.

## COUNT II – FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)(1)(A)/SECTION 43(A) OF THE LANHAM ACT
### (JSN and ASHE)

55.     ASW realleges and incorporates by reference the allegations contained in paragraphs 1-32 as though fully set forth herein.

56.     ASW has used the Perfect Patio trademark (Mark) as exclusive licensee in connection with the sale of patio screens in commerce in Florida and across the United States since at least 2017 .

57.     ASW has invested significant time and money into building the Mark with annual sales reaching approximately $8.2 million.

58.     ASW uses the Mark to signify the origin of its patio screen goods and displays it openly to the public as pictured below. *See* https://perfectpatioscreen.com.



59.    Defendants unlawfully used the Mark in commerce by importing Screens to a third-party ASW competitor, EMS with the Mark affixed to the Screen's packaging. See below and Exhibit B.



60.    The depiction of the Mark by Defendants is identical to the way ASW displays it to the public and the above-pictured label is the same label JSN had always used to import screens to ASW. Thus, upon information and belief, JSN simply slapped the same label on Screens it sent to third parties like EMS.

61.    Upon information and belief, JSN imported Screens in commerce using the Mark on more than the one occasion alleged above to other third parties besides EMS.

62.    ASW did not consent to or authorize the above-described use in any way and Defendants never compensated ASW for it either.

63.    Upon information and belief, Defendants' unauthorized use of the Mark is ongoing.

64.     As, upon information and belief, a managing member and CEO of JSN, Defendant Steven Ashe directed and controlled and at all relevant times acted as "the moving force" behind JSN's importation activities, including the delivery of the Screens to EMS that bared the Mark, and upon information and belief, orchestrated the same unlawful act with other third parties as well, making him personally liable for any violation by JSN of the Lanham Act. *See Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1184 (11th Cir. 1994).

65.     The above-described acts by Defendants are likely to cause confusion, mistake or deceive the minds of the public as to the affiliation, connection or association of JSN with ASW and the Mark, which constitutes false designation of origin and unfair competitive practice under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

66.     The above-described acts of Defendants, if not permanently enjoined by this Court, are likely to deceive and continue to deceive members of the public.

67.     The above-described acts of Defendants have irreparably harmed and, if not permanently enjoined, will continue to irreparably harm ASW.

68.     The above-described acts of Defendants have irreparably harmed and, if not permanently enjoined, will continue to irreparably harm the interest of the public in being free from confusion, mistake, and deception.

69.    By reason of Defendants' unlawful acts, ASW has suffered and will continue to suffer injuries, including injury to ASW's business reputation. However, ASW's remedies at law are not adequate to compensate it for all the injuries inflicted by Defendants. Accordingly, ASW is entitled to entry of permanent injunctive relief requiring Defendants to cease its false and misleading advertising and promotions and unfair competitive practices.

70.    Because the above-described acts of Defendants are willful, the Court should award Defendants' profits (enhanced at the Court's discretion), treble damages, and costs under 15 U.S.C. § 1117 to Plaintiffs.

71.    This is an exceptional case, making Plaintiffs eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

### COUNT III- BREACH OF THE COVENANT
### OF GOOD FAITH AND FAIR DEALING
### (JSN)

72.    ASW realleges and incorporates by reference the allegations contained in paragraphs 1-32 as though fully set forth herein.

73.    As noted above, the Parties first entered into an Exclusivity Agreement on May 2, 2017, performed under it uninterrupted for six years and ratified it via the Exclusivity Agreement on November 23, 2024.

74.     Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards designed to protect the parties' reasonable contractual expectations.

75.     Pursuant to the Exclusivity Agreement, in order to perform and enjoy its benefit of the bargain, ASW had to market and distribute the Screens in the territory of the United States. Such performance depended on JSN importing to it a reasonable amount of Screens.

76.     In practice, ASW would make purchase orders of the Screens with JSN and JSN would import and deliver the amount of Screens ASW ordered.

77.     On or about January 15, 2025, ASW placed an order for 3 containers of Screens.

78.     JSN did not deliver the 3 containers that ASW ordered.

79.     Upon information and belief, JSN instead diverted those 3 containers and more to ASW's competitors and customers at ASW's sole detriment, costing it no less than $236,632 in lost gross sales.

80.     ASW and JSN also agreed on a commitment of 1 order of Screens per month from April through December of 2025—8 orders in total.

81.     JSN did not deliver any of those orders of Screens to ASW either.

82.     Upon information and belief, JSN instead also diverted the 8 orders and a significant portion of the rest of its supply of Screens away from ASW to

ASW's competitors and customers in retaliation for ASW sourcing other screens from Taiwan.

83.     As a result, ASW's sales of Screens plummeted from a high-water mark of $489,857 in March 2025 to $168,234 in August 2025 when the Parties stopped working together.

84.     JSN also knowingly used JSN's Mark without consent in importing the Screens, many of which had gone to ASW in the past, directly to competitors and customers, in violation of the Exclusivity Agreement and ASW's trademark and other rights.

85.     Upon information and belief, JSN also diverted at least one subset of Screens reserved for ASW designated by orange or green thread to third parties to ASW's sole detriment.

86.     JSN's above-described acts constitute a breach of the covenant of good faith and fair dealing.

87.     The consequences of JSN's breach are material, not only because ASW lost significant profits from the undelivered Screens but also lost profits from sales of metal goods that its customers traditionally and routinely made when purchasing Screens in the past.

88.     As a result of JSN's breach of good faith and fair dealing as described above, ASW has suffered damages in an amount uncertain to be determined at trial by a jury.

## COUNT IV – COMMON LAW TRADEMARK INFRINGEMENT
### (JSN and ASHE)

89.     ASW realleges and incorporates by reference the allegations contained in paragraphs 1-32 as though fully set forth herein.

90.     ASW owns commercial interest and exclusive rights in a valid trademark, "Perfect Patio" (Mark) as the exclusive licensee, through continuous use in interstate commerce in connection with the marketing and distribution of goods, including the Screens, which entitles it to protection under Florida law.

91.     ASW has invested significant time and money in building the Perfect Patio brand and Mark and has amassed over $8.2million in sales as a result since it first started using it in commerce in 2016.

92.     Defendants did not have ASW's or Brown's authorization, written or orally, express or implied, to use the Mark in connection with the sale or distribution of the Screens to third parties.

93.     Defendants knew they did not have authorization to use the Mark without consent by virtue of the express prohibition against doing so in the Exclusivity Agreement.

94. As shown above and in Exhibit B, Defendants' mark is identical to ASW's Perfect Patio Mark (they simply slapped the Mark on Screens imported to third parties) and both are used in connection with the same goods in the same channels of trade and sold to, in many cases the same customers and competitors.

95. In an email dated September 29, 2025, ASW, through CEO Brown, demanded Defendants stop using the Mark in sales/imports to third parties. Defendant Ashe denied ever doing so and promised not to in the future.

96. However, Defendants did not stop and upon information and belief, continue to infringe on the Mark to this day.

97. Defendants' above-described acts have and are likely to continue to cause confusion, mistake and deception among consumers, the public and the trade as to whether Defendants' products are affiliated with, sponsored by, or endorsed by ASW.

98. Defendants' conduct constitutes trademark infringement under Florida common law and has caused and will continue to cause ASW to incur damages and harm to its Mark, business reputation and good will.

99. ASW has been and will continue to be irreparably harmed and damaged by the foregoing acts and ASW's remedies at law are inadequate to compensate it for this harm and damage.

100.     Accordingly, ASW, in addition to monetary damages, is entitled to entry of permanent injunctive relief requiring Defendants to cease its infringing activities.

101.     Furthermore, because Defendants' infringing acts were willful, ASW is entitled to punitive and enhanced and/or treble damages and their reasonable attorney's fees and costs to deter others from engaging in the same.

### COUNT V – COMMON LAW UNFAIR COMPETITION
### (JSN and ASHE)

102.     ASW realleges and incorporates by reference the allegations contained in paragraphs 1-32 as though fully set forth herein.

103.     Defendants' deliberate use of the Mark in connection with identical goods (the Screens) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with ASW, or as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by ASW.

104.     The above-described acts of Defendants have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from confusion, mistake, and deception regarding the Perfect Patio Mark.

105.     By reason of Defendants' acts, ASW's remedies at law are not adequate to compensate for the injuries inflicted by Defendants. Accordingly,

18

ASW is entitled to entry of permanent injunctive relief, in addition to monetary relief in the form of disgorgement of Defendant's profits and corrective advertising costs and any other relief the Court deems fit.

106.    Furthermore, because Defendants' infringing acts were willful, ASW is entitled to punitive and enhanced and/or treble damages, and their reasonable attorney's fees and costs to deter others from engaging in the same.

## COUNT VI-- DECEPTIVE AND UNFAIR TRADE PRACTICES IN VIOLATION OF SECTION 502.201, ET SEQ., FLORIDA STATUTES
### (JSN and ASHE)

107.    ASW realleges and incorporates by reference the allegations contained in paragraphs 1-32 as though fully set forth herein.

108.    Section 501.204(1), Florida Statutes states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

109.    Section 501.203(8), Florida Statutes, defines "[t]rade or commerce" as:

"The advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity."

110.    The provisions of FDUTPA shall be "construed liberally" to promote and "protect the consuming public and legitimate business enterprises from those

who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." §501.202, Fla. Stat.

111.    A person that willfully engages in a deceptive or unfair act or practice is liable for a civil penalty of Ten Thousand Dollars ($10,000) for each such violation, pursuant to §501.2075, Fla. Stat. Willful violations occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to §501.2075, Fla. Stat.

112.    Defendants knew they did not own the Mark or have license or permission to use it outside the parameters of the Exclusivity Agreement, but they did anyway, importing Screens using the Mark directly to third party competitor EMS and upon information and belief, others, without authorization from or compensation to ASW or Brown.

113.    Defendants also, upon information and belief, diverted imports from ASW to ASW's competitors and customers to diminish ASW's supply and decrease their sales to retaliate for ASW sourcing other screens from Taiwan.

114.    The above-described acts of Defendants were made in the conduct of Defendants' business, trade, or commerce.

115.    The above-described acts of Defendants constitute unfair competition under Florida common law, and has caused, and will continue to cause ASW to

incur damage and irreparable harm and, if not enjoined, will continue to irreparably harm ASW, its goodwill, business reputation and Mark.

116.    Because Defendants' unlawful acts were willful, ASW is entitled to punitive and enhanced and/or treble damages and their reasonable attorney's fees and costs to deter others from engaging in such malicious practices and Defendants must pay civil penalties under the Act and this Court should grant whatever other relief it deems fit.

**PRAYER FOR RELIEF**

WHEREFORE, for the reasons stated above, Plaintiff, ASW, respectfully requests that this Court:

(i)     On Count I, award Plaintiff damages as a result of Defendant JSN's multiple breaches of the Exclusivity Agreement;

(ii)    On Count II, award Plaintiff damages as a result of Defendants JSN's and Steven Ashe's violations under §15 U.S.C. 1125(a)(1)(A) of the Lanham Act;

(iii)   On Count III, award Plaintiff damages as a result of Defendant JSN's breach of the covenant of good faith and fair dealing of the Exclusivity Agreement;

(iv)    On Count IV, award Plaintiff damages, treble damages and/or exemplary damages, punitive damages and permanent injunctive

relief as a result of Defendants JSN's and Steven Ashe's trademark infringement under Florida law;

(v)     On Count IV, award Plaintiff damages, enhanced and/or treble damages, punitive damages and permanent injunctive relief as a result of Defendants JSN's and Steven Ashe's unfair competition under Florida common law;

(vi)    On Count VI, award Plaintiff damages as a result of Defendants JSN's and Steven Ashe's violations under § 502.201, et. Seq., of Florida's Deceptive Trade and Unfair Practices Act and assess the appropriate civil penalties thereunder;

(vii)   Award Plaintiff its reasonable attorneys' fees and costs and prejudgment interest; and

(viii)  Grant such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiff Aluminum Specialties Wholesale, Inc. respectfully demands a trial by jury on all issues so triable.

[*Remainder of page intentionally left blank*]

                                    Respectfully submitted,

February 2, 2026                    */s/ Andres A. Munoz*
                                    Andres A. Munoz (FL Bar No. 1030820)
                                    ROMANO LAW PLLC
                                    777 SW 37th Avenue, Suite 510
                                    Miami, Florida 33135
                                    (786) 744-6400
                                    andres@romanolaw.com

                                    Stephen Reich, Esq. (to be Lead Counsel)
                                    *Application for Special Admission Forthcoming*
                                    361 Newbury Street, Suite 409
                                    Boston, Massachusetts 02115
                                    (917) 204-7024
                                    sreichesq@stephenreichlaw.com

                                    *Counsel for Plaintiff Aluminum Specialties
                                    Wholesale, Inc.*